CASE NO.:  11-15743-F
_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

REINALDO RAMON LAMONICA, *et al.*,

Plaintiffs/Appellees,

vs.

SAFE HURRICANE SHUTTERS, INC., *et al.*,

Defendants/Appellants.
_____

**APPELLANTS' BRIEF ON THE MERITS**
_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DC DKT NO. 07-61295-CIV-COHN
_____

CHRIS KLEPPIN, ESQ.
Glasser, Boreth & Kleppin, P.A.
8751 W. Broward Blvd
Suite 105
Plantation, FL 33324
Telephone:   (954) 424-1933
Facsimile:    (954) 474-7405

Counsel for Appellants

*Lamonica, et al. v. Safe Hurricane Shutters, Inc.*, Case No. 11-15743

## CERTIFICATE OF INTERESTED PERSONS AND
## <u>PUBLIC DISCLOSURE STATEMENT</u>

1.    Safe Hurricane Shutters, Inc., Appellant

2.    Steve Heidelberger, Appellant

3.    Francis McCarroll, Appellant

4.    Edward Leiva, Pro Se, Appellant

5.    Chris Kleppin, counsel for Appellants

6.    Lloyd S. Glasser, counsel for Appellants

7.    The law firm of Glasser, Boreth & Kleppin, counsel for Appellants

8.    Augustin Milan, Appellee

9.    Mario Feliciano, Appellee

10.    Jamie H. Zidell, Esq., counsel for Appellees

11.    Karl David Kelly, Esq., counsel for Appellees

12.    Sam Jones Smith, Esq., counsel for Appellees

13.    Marguerite Maria Longoria, Esq., counsel for Appellees

14.    Honorable James I. Cohn

15.    Honorable Jose A. Gonzalez

16.    Honorable Barry S. Seltzer

## STATEMENT REGARDING ORAL ARGUMENT

In this Fair Labor Standards Act case in which an appeal is taken as to a jury verdict partially in favor of two of the Plaintiffs on their overtime claims, oral argument is warranted because several issues of first impression exist.  The issue is whether a jury award in a gross amount should be reduced by the Court post-trial to a net amount (to account for the fact that the employer must pay withholding—social security and Medicare taxes—to the United States government).  Other issues of first impression are whether the doctrine of *in pari delicto* applies as a defense to a FLSA claim, when one of the Plaintiffs applied for work with false social security documents (which is a felony) and both Plaintiffs failed to report the income they received from the Defendants on their income tax returns.  This Court has applied the defense to other actions under federal law, such as RICO.  Additionally, this appeal presents interpretations of this Court's prior precedent with respect to when an individual officer with day-to-day control can be personally liable for the overtime—the issues are whether such an individual must actually be an officer (as opposed to a absentee, minority owner) and the frequency with which the alleged day-to-day must be exercised—for example, one of the individual Defendants was only present

once every month or so, did not supervise the Plaintiffs or even know how to perform their job, and he had no involvement in pay issues, and the question becomes whether someone like that can be individually liable.  A sister case (Palma v. Safe Hurricane Shutters, Inc., Case No. 07-22913-CIV-SIMONTON) also went to a jury trial, and the jury found that the individuals were not individually liable and that no overtime or minimum wages were worked.  Oral argument is also warranted because the record is voluminous, particularly since there was a jury trial and lengthy post-trial motions, and approximately 33% of the Southern District of Florida's docket consists of FLSA cases, and the issues presented by this appeal are arising in case after case.

## CERTIFICATE OF TYPE SIZE AND STYLE

This Brief on the Merits has been prepared using 14.0 Times New Roman print.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND

PUBLIC DISCLOSURE STATEMENT.................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .....................................................i

CERTIFICATE OF TYPE SIZE AND STYLE.............................................................ii

TABLE OF CONTENTS............................................................................. iii

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF JURISDICTION .................................................................xi

ISSUES PRESENTED .................................................................................1

STATEMENT OF THE CASE ......................................................................4

A.      COURSE OF THE PROCEEDINGS & STATEMENT OF FACTS .................4

B.      STATEMENT OF THE STANDARD OF REVIEW .......................................22

SUMMARY OF THE ARGUMENT .........................................................22

ARGUMENT.............................................................................................26

I.   The District Court Committed Reversible Error in Failing to Grant Rule
50 in Favor of the Defendants' on the Ground that the Individual Defendants
Are Not Individually Liable, When Those Defendants Were Not Officers,
Were Only Absentee Minority Owners, Had No Day-to-Day Control
(Everyone Admitted Defendant Ed Leiva Had Such Control), Defendant
Heidlberger Was Not Even There Once a Month for a Couple of Days,
Defendant McCarroll Was Only There About Half of the Time, and Had No
Interaction with the Installer-Plaintiffs but Rather Only the Sales Staff, and
Neither Heidelberger Nor McCarroll Supervised the Plaintiffs or Set Their
Pay, Nor, as Minority Owners, Could They Have Any Say in Such
Decisions; Alternatively, a New Trial Is Warranted Because of The Jury
Instructions..................................................................................26

II.    The District Court Committed Reversible Error When It Failed to Reduce the Jury Verdict to a Net Amount from the Gross Wages that Were Awarded by the Jury, and the Court Should Note that Reducing Plaintiff Milan's Gross Award to a Net Amount Is Illegal, Because He Is an Illegal Alien, Which Should Require JMOL in Favor of Defendants .................................33

III.    The District Court Committed Reversible Error When it Failed to Instruct the Jury as to the Fluctuating Workweek Method of Calculating Overtime, and When it Failed to Grant Rule 50 in Favor of the Defendants as to Its Application, Given that the Plaintiffs Were Paid A Salary Every Week No Matter How Many Hours That They Worked, Their Hours Fluctuated Every Week, and They Always Cashed Their Paychecks; Alternatively, a New Trial Is Warranted on This Issue ...............................................35

IV.    The District Court Committed Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to Plaintiff Milan, Because He Applied for Work With False Social Security Documents and Committed Income Tax Evasion Concerning His Earnings While Working for the Defendants and, Concerning Plaintiff Feliciano, His Income Tax Evasion, as Well, Pursuant to the Doctrine of *In Pari Delicto* ...............................................................39

V.    The District Court Committed Reversible Error in Excluding from Evidence Testimony from Defendant Leiva That Witness Rolando Ibacache (Who Was a Plaintiff in the Companion Case *Palma v. Safe Hurricane Shutters, Inc.*, Case No. 07-22913) Told Leiva that Plaintiffs' Attorney J.H. Zidell, Esq. Fabricated the Overtime Claims Instructing the Plaintiffs in this Case and in *Palma* to Say That They Worked 60 Hours Every Week When They Really Worked Less Than 40 Hours Every Week (Ibacache Testified at Trial that He Could Not Deny Telling Leiva This), Which Warrants a New Trial, Particularly When the *Palma* Jury Found in Favor of the Defendants, Including that No Overtime Was Worked and No Minimum Wages Were Owed ...............................................................................................................51

VI.    The District Court Committed Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to the Sufficiency of the Evidence that Overtime Hours Were Worked ...................................................................................56

CONCLUSION...........................................................................................................59

iv

CERTIFICATE OF COMPLIANCE..........................................................................60

CERTIFICATE OF SERVICE ..................................................................................60


## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aguilar v. E.C. Mgmt, Corp.,*

    Case No. 11-23581-CIV-SEITZ..........................................................................50

*Aguilar v. E.C. Mgmt, Corp.,*

    Case No. 12-20678-CIV-MORENO ...................................................................50

*Anaconda Federal Credit Union v. West,*

    483 P.2d 909, 911 (Mont. 1971)........................................................................45

*Anderson v. Mt. Clemens Pottery Co.,*

    328 U.S. 680, 687-88 (1946) .............................................................................57

*Archie v. Grand Central P'ship, Inc.,*

    86 F. Supp. 2d 262, 273 (S.D.N.Y. 2000) ........................................................34

*Barrera v. Valero Doral, Inc.,*

    2011 WL 4443965 (S.D. Fla. 2011) ..................................................................58

*Bateman v. Mnemonics,*

    79 F.3d 1532 (11th Cir. 1996) ..........................................................................22

*BKCAP, LLC v. Captec Franchise Trust 2000-1,*

    2011 WL 4916590, *5-7 (N.D. Ind. 2011).........................................................55

*Branzburg v. Hayes,*

    408 U.S. 665, 696-97 (1972) ............................................................49

*Casseus v. First Eagle, L.L.C.,*

    2008 WL 1782363 (S.D. Fla., April 18, 2008)................................27

*Certa v. Wittman,*

    370 A.2d 573 (Md. 1977) ................................................................47

*Collins v. Blantern,*

    95 Eng. Rep. 850, 852 (1767).........................................................46

*Comb v. Plantation Patterns,*

    106 F.3d 1519, 1526 (11th Cir. 1997) .............................................22

*Condo v. Sysco Corp.,*

    1 F.3d 599, 602 (7th cir. 1993) .......................................................35

*Dacatur Ventures, L.L.C. v. Stapleton Ventures, L.L.C.,*

    2006 WL 1367436 (S.D. Ind.) ........................................................48

*Davis v. Friendly Express, Inc.,*

    2003 WL 21488682, *2 (11th Cir. 2003) ....................................35,37

*Dol v. Cielo in the Grove,*

    2008 WL 2773552 (S.D. Fla. 2008) ................................................56

*Ford v. Kaufman,*

    1985 WL 584, *1 (N.D. III)............................................................34

*Gatto v. Mortgage Specialists of Illinois, Inc.,*

    442 F.Supp. 2d 529, 534-36 (N.D. III. 2006) ....................................................56

*Highlander v. K.F.C. Int'l Mgmt. Co.,*

    805 F.2d 644, 647-48 (6th cir. 1986) ..................................................................35

*Hoffman Plastic Compounds, Inc. v. NLRB,*

    535 U.S. 137 (2002) ..........................................................................42,43,44,46

*In re Today's Destiny, Inc.,*

    388 B.R. 737 (S.D. Tex. 2008) .........................................................................48

*Jin-Ming Lin v. Chinatown Restaurant Corp.,*

    771 F.Supp. 2d 185 (D. Mass. 2011) ................................................................43

*Josendis v. Wall to Wall Residence Repairs, Inc.,*

    662 F.3d 1292 (11th Cir. 2011) .......................................................................43

*Laplante v. Lake Worth Terrace,*

    725 F.Supp. 2d 1358 (S.D. Fla. 2010) ..............................................................56

*Morgan v. Family Dollar Stores, Inc.,*

    551 F.3d 1233, 1277 n. 68 (11th Cir. 2008) .....................................................56

*Myers v. The Copper Cellar Corporation,*

    192 F.3d 546, 551 (6th cir. 1999) .................................................................56,57

*Neiman v. Provident Life & Accident Ins. Co.,*

    217 F. Supp. 2d 1281,1286 (S.D. Fla. 2002) ...........................................41,42,47

*Neuman v. CTRL Sys., Inc.,*

    2009 WL 4730722 (S.D. Fla. 2009) ....................................................41

*Nisselson v. Lymont,*

    469 F.3d 143 (1st Cir. 2006)...............................................................48

*Norelus v. Denny's Inc.,*

    628 F. 3d 1270 (11th Cir. 2010) .........................................................50

*Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards,*

    437 F. 3d 1145 (11th Cir. 2006) ..............................................41,47,48

*Olivas v. A Little Havana Check Cash, Inc.,*

    324 Fed. Appx. 839 (11th Cir. 2009)...................................................33

*Overnight Motor Transp. Co v. Missel,*

    316 U.S. 572, 580 (1942)....................................................................35

*Palma v. Safe Hurricane Shutters, Inc.,*

    Case No. 07-22913-CIV-SIMONTON................................ ii, iv,3,4,51

*Patel v. Quality Inn south,*

    846 F. 2d 700 (11th Cir. 1988) ...........................................................43

*Patel v. Wargo,*

    803 F.2d 632, 637 (11th Cir. 1986) ....................................................27

*Perez v. Sanford-Orlando Kennel Club, Inc.,*

    515 F.3d 1150, 1160-61 (11th Cir. 2008)...........................................27

*Renteria v. Italia Foods, Inc.,*

    2003 WL 21995190 (N.D. III)......................................................................34,43

*Roberts v. United States,*

    445 U.S. 552, 557-58 (1980) ...............................................................................49

*Santos v. Cuba Tropical, Inc.,*

    F. Supp. 2d--, 2011 WL 5361118 (S.D. Fla.)......................................................29

*Sirkin v. Fourteenth Street Store,*

    108 N.Y.S. 830 (N.Y. Sup.Ct., 1st Dep't 1908)..................................................47

*Stone v. Freeman,*

    82 N.E. 2d 571, 572 (N.Y. 1948).........................................................................46

*Ulin v. Lovell's Antique Gallery,*

    2010 WL 3768012 (N.D. Cal.) ............................................................................43

*Thomas v. Ratiner,*

    462 So. 2d 1157 (Fla. 3d DCA 1984)..................................................................47

*Tocci v. Lembo,*

    92 N.E. 2d 254 (Mass. 1950)...............................................................................47

*United States v. Batmasian,*

    Case No. 08-60089-CIV-MARRA ......................................................................34

*United States v. Johnansson,*

    62-1 U.S. Tax Cas. ¶9130 at 83, 197 (S.D.Fla. 1961).........................................50

*United States v. Snipes,*

611 F.3d 855 (11th Cir. 2010) ............................................................41

*Weil v. Neary,*

278 U.S. 160, 173-74 (1929) ............................................................46

*Wirtz v. Pure Ice Co.,*

322 F.2d 259, 263 (8th Cir. 1963) ....................................................28

## Statues

28 U.S.C. § 1291 (2000) ........................................................................ viii
28 U.S.C. § 1291 ................................................................................... viii
29 U.S.C. § 201 et seq. .............................................................................4
29 U.S.C. § 207(a)(1) ...............................................................................27
29 U.S.C. § 206 ........................................................................................58
29 U.S.C. § 207 ........................................................................................58
29 U.S.C. § 203(d) ...................................................................................27
29 U.S.C. § 3402(a)(1) .............................................................................33
29 U.S.C. § 7202 ......................................................................................34
29 C.F.R. § 778.114 .................................................................................35
29 C.F.R. § 778.114(a) .............................................................................37
8 U.S.C.  § 1546(a)(1) ..............................................................................40
8 U.S.C.  § 1546(a) ..................................................................................40
8 U.S.C.  § 1324(a)(1)(B)(i) ....................................................................40
8 U.S.C.  § 1324(c)(a) .............................................................................43
8 U.S.C.  § 1324(a)(1)(A)(iii) ................................................................48

## Rules

Federal Rule of Appellate Procedure 32(a)(7)(B) ........................................60

## <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (2000), which grants this Court jurisdiction over final judgments from a United States District Court.  The Final Judgment in this case was issued in this case (R209), is an appealable final judgment as contemplated by 28 U.S.C. § 1291.

## <u>ISSUES PRESENTED</u>

### I.

Did the District Court Commit Reversible Error in Failing to Grant Rule 50 in Favor of the Defendants' on the Ground that the Individual Defendants Are Not Individually Liable, When Those Defendants Were Not Officers, Were Only Absentee Minority Owners, Had No Day-to-Day Control (Everyone Admitted Defendant Ed Leiva Had Such Control), Defendant Heidlberger Was Not Even There Once a Month for a Couple of Days, Defendant McCarroll Was Only There About Half of the Time, and Had No Interaction with the Installer-Plaintiffs but Rather Only the Sales Staff, and Neither Heidelberger Nor McCarroll Supervised the Plaintiffs or Set Their Pay, Nor, as Minority Owners, Could They Have Any Say in Such;, Alternatively, Is a New Trial Warranted Because of the Jury Instructions?

### II.

Did the District Court Commit Reversible Error When It Failed to Reduce the Jury Verdict to a Net Amount from the Gross Wages that Were Awarded by the Jury, and Should the Court Note that Reducing Plaintiff Milan's Gross Award to a Net Amount Is Illegal, Because He Is an Illegal Alien, and Should that Require JMOL for Defendants?

## III.

**Did the District Court Commit Reversible Error When it Failed to Instruct the Jury as to the Fluctuating Workweek Method of Calculating Overtime, and When it Failed to Grant Rule 50 in Favor of the Defendants as to Its Application, Given that the Plaintiffs Were Paid A Salary Every Week No Matter How Many Hours That They Worked, Their Hours Fluctuated Every Week, and They Always Cashed Their Paychecks; Alternatively, Is a New Trial Warranted on This Issue?**

## IV.

**Did the District Court Commit Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to Plaintiff Milan, Because He Applied for Work With False Social Security Documents and Committed Income Tax Evasion Concerning His Earnings While Working for the Defendants and, Concerning Plaintiff Feliciano, His Income Tax Evasion, as Well, Pursuant to the Doctrine of *In Pari Delicto*?**

2

**V.**

**Did the District Court Commit Reversible Error in Excluding from Evidence Testimony from Defendant Leiva That Witness Rolando Ibacache (Who Was a Plaintiff in the Companion Case *Palma v. Safe Hurricane Shutters, Inc.*, Case No. 07-22913) Told Leiva that Plaintiffs' Attorney J.H. Zidell, Esq. Fabricated the Overtime Claims Instructing the Plaintiffs in this Case and in *Palma* to Say That They Worked 60 Hours Every Week When They Really Worked Less Than 40 Hours Every Week (Ibacache Testified at Trial that He Could Not Deny Telling Leiva This), Which Warrants a New Trial, Particularly When the *Palma* Jury Found in Favor of the Defendants, Including that No Overtime Was Worked and No Minimum Wages Were Owed?**

**VI.**

**The District Court Committed Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to the Sufficiency of the Evidence that Overtime Hours Were Worked?**

## STATEMENT OF THE CASE

## A.    COURSE OF THE PROCEEDINGS & STATEMENT OF FACTS

On September 12, 2007, Plaintiffs Reinaldo Lamonica and Ronaldo Gomez Morsa sued the Defendants Edward Leiva and Safe Hurricane Shutters, Inc. ("SHS"), asserting that they were not paid their overtime and minimum wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (R1). Plaintiffs Augusto Milan and Mario Feliciano filed notices of consent to join the action on November 14, 2007. [D.E.6]. Numerous other plaintiffs joined on the same date. [D.E.7,9-12]. At about the same time, a companion case was brought, in which seven plaintiffs sued. *Palma v. Safe Hurricane Shutters, Inc.*, Case No. 07-22913-CIV-Simonton. Two of the plaintiffs in *Palma*, Yerko Aguirre and Rolando Ibacache, testified at trial in this case. The jury verdict in the *Palma* case, was for the Defendants an all issues, which verdict was rendered on November 3, 2011, months after this case's trial; plaintiffs in that case did not appeal. [D.E.200 in *Palma*]. An Amended Complaint was filed, adding all of the Plaintiffs to the caption of the case, and also adding Defendants Heidelberger and McCarroll who were added after Plaintiffs' counsel learned that neither SHS nor Leiva had any assets. [D.E.37; D.E.210 at 138-39]. Defendants answered. [D.E.42].

During discovery, some of the Plaintiffs did not appear for deposition, one said he did not intend to sue the individual Defendants, and it was revealed that

most of the Plaintiffs (other than Plaintiff Feliciano) were illegal aliens who applied for work with false social security information; Defendants moved for summary judgment on these grounds, and on the grounds that the corporate Defendant was not an enterprise engaged in interstate commerce. [D.E.63]. The court granted summary judgment on only one ground, namely, that the corporate Defendant is not an enterprise engaged in interstate commerce. [D.E.102]. The Plaintiffs appealed [D.E.104], and this Court reversed and remanded. [D.E.126]. Thereafter, the district court denied the remaining grounds that the Defendants had sought summary judgment on. [D.E.127].

As the trial date approached, it was unclear whether Plaintiffs Lamonica and Lamonica-Soler were going to appear for trial. [D.E.131]. Same with other Plaintiffs. [D.E.137,140]. As a result, two Plaintiffs were dismissed from this action, and the Court ruled that any Plaintiffs who do not appear for trial will be dismissed for failure to prosecute. [D.E.152,153].

Shortly before trial, the court transferred the case to The Honorable Jose Gonzalez to try, because the court was in a lengthy criminal trial. The jury trial was then held from April 11-18, 2010. [D.E.182-193]. During the trial, the court granted Defendants' Rule 50 and Rule 41(b) motions as to all Plaintiffs who did not appear for trial. [D.E.214 at 95-97]. Plaintiffs' counsel refused to inform defense counsel both before trial and during the trial which Plaintiffs were going to

appear. [D.E. 239]. The Court granted Rule 50 as to Plaintiffs' (Feliciano and Milan) claims under the Florida Constitution for alleged minimum wages due. [D.E.214 at 133-34]. The jury then rendered a verdict in favor of Augustin Milan in the amount of $1,312.50 and Mario Feliciano in the amount of $20,849.38 on their overtime claims; these were gross amounts, that is, they do not reflect the withholding of payroll taxes. [D.E.193]. Defendants timely filed post-trial motions (including a motion to alter or amend the Final Judgment by concerting the gross award into a new amount) on the issues contained in this Appeal, which were also preserved at the Rule 50(a) stage during trial. [D.E.217, 218, 235, 252, 256]. Months after the post-trial motions were filed, and one day before the verdict in *Palma*, the district court in this case entered a one-page order denying the post-trial motions without analysis. [D.E.264]. This Appeal followed. [D.E.266].

At trial some very disturbing evidence was adduced concerning that this case may be fraudulent, as witness Ibacache testified, in pertinent part, as follows:

> Q:  You told Mr. Leiva that the attorney said oh, let's say you worked all these hours and we'll get all these people involved and we'll say that there was a big overtime violation here when there really wasn't one. That's what you told Mr. Leiva?
>
> A:  I don't remember. Maybe it is here, but I don't remember.

> Q:  You might have said that.  You don't recall.  That rings a bell. You might have said something like that.  You can't deny it?
>
> A:  I said I did not remember.

[D.E.211 at 53-54].  The district court excluded from evidence Leiva's testimony that Ibacache did tell him that, because Leiva was going to testify that Ibacache did tell him that Zidell made up the whole case and there was no legitimate overtime case, but it was objected to on hearsay grounds and sustained, as follows:

> Q:  What did Mr. Ibacache tell you about the overtime lawsuit, how that got started?
>
> A:  He told me –
>
> Q:  Hearsay objection.
>
> The Court:  Sustained.

[D.E.214 at 75, Apr. 15, 2011].  In *Palma*, this testimony was admitted, and there was no attempt to even cross-examine Leiva about it, or to put any evidence into the record to refute it.

Neither Heidelberger nor McCarroll are officers of SHS, but rather are only minority shareholders at the director level.  [D.E.212 at 43, 44-45, 106].  They had 22% ownership interests in the company.  *Id.*  Further, they did not have day-to-day operational control over the business, and they made no employment decisions at all (concerning laborers like the Plaintiffs), and no decisions whatsoever with respect to the setting of pay.  [D.E.212 at 85, 88-92, 95].

Heidelberger was not an officer, but rather was only a minority shareholder at the director level.  [D.E.212 at 106].  Heidelberger knows this from having reviewed the articles of incorporation of the business.  *Id.* at 125.  These articles of incorporation, and the other corporate documents of SHS, show that neither Heidelberger nor McCarroll were officers, and were admitted into evidence. [D.E.256].  Heidelberger had a 22% ownership interest in the company.  [D.E.212 at 125].  The agreement that McCarroll, Heidelberger, and Leiva had was that because Heidelberger and McCarroll lived out of state (Colorado and New York respectively), they were going to provide solely financial support to the company, and Leiva was going to run it day-to-day.  *Id.* at 126-27.  Consequently, Heidelberger was not involved in hiring or firing *decisions*, but under the orders of Leiva he assisted in the firing of Tom Sullivan (a department head who got caught stealing), simply by being there when he was fired and escorting him out of the building with someone else under the order of Leiva.  *Id.* at 108,109.

Before the business started in May, 2006, Heidelberger came to Florida from his home in Colorado to have an initial meeting with Leiva and others in both January and March,2006.  *Id.* at 112-13,114.  Leiva introduced his department heads to Heidelberger at those meetings who Leiva had hired.  *Id.* at 113,125,131, 132,133-34.  Heidelberger came back to Florida in May,2006, because Leiva wanted to show him the new warehouse space.  *Id.*  Heidelberger did not come

back to Florida until October,2006. *Id.* at 114. During these visits, he would stay about two days. *Id.* Heidelberger visited some customers with Leiva. *Id.* at 115. Heidelberger performed a cost analysis and figured out the company was losing money because it was not charging enough for its services, and he told Leiva about this, but Leiva did nothing (he did not have to obey the individual Defendants). *Id.* at 115-16,137-38. Heidelberger was not in a position to give Leiva ultimatums. *Id.* at 117. The next time Heidelberger was in Florida was December,2006. *Id.* at 116. Heidelberger then came back to Florida in March,2007, and then came in late May for his final time visiting the business. *Id.* at 119-20. On these six (6) occasions that Heidelberger came to Florida, he saw McCarroll on two (2) of them and thus opined that McCarroll was probably present one-third of the time. *Id.* at 122. For the six (6) times that Heidelberger came to Florida, he was here for about two days. *Id.* at 127. During these six trips, Heidelberger did not involve himself in the operations of the company, or sub-departments of the company, did not hire or fire anyone, and was not involved in personnel decisions of any kind, nor was he involved in human resources decisions, or pay decisions. *Id.* at 134-35.

Heidelberger never set any corporate policies for the company. *Id.* He would do whatever Leiva would tell him to do when he visited the company. *Id.* at 128. Heidelberger was not involved in the day-to-day operation of the business, as he could not be from Colorado, as follows:

> Q:   Were you ever involved in the day-to-day operations of Safe Hurricane Shutters?
>
> A:   I can't be from Colorado.

*Id.* at 128.  Heidelberger was not even interested in knowing what was going on day-to-day, because he was just an investor.  *Id.*  He did not supervise any employees, and was not responsible for the hiring and firing of any employees.  *Id.* at 128-29.  Heidelberger did not set any wages or salaries for any employees at Safe Hurricane Shutters, nor was he even remotely involved in any such decisions. *Id.* at 129.

Heidelberger does not know how to install the shutters.  *Id.* at 129-30. Thus, he could not and did not supervise the installers.  *Id.* at 140.  He never made any employment decisions concerning the Plaintiffs in this case or any installers. *Id.* at 141.  He was not involved in pay decisions concerning installers from a policy perspective.  *Id.* at 142.  He could not have put it more succinctly,

> Q:   Were you an officer with day-to-day operational control at any time at Safe Hurricane Shutters?
>
> A:   Never.

*Id.* at 147.

McCarroll was not an officer, but rather was only a minority shareholder at the director level.  [D.E.212 at 43, 44-45, 106].  McCarroll invested $600,000 into the business, while Heidelberger invested approximately $400,000.  [D.E.212 at

44]. McCarroll never collected a dime from his investment. *Id.* at 48. McCarroll was not an officer, but was a director, and considered himself to be an absentee investor; the articles of incorporation list him as being a director only. *Id.* at 44-45, 83-84. They were introduced into evidence as Defendants' Exhibit 2 and an amendment as Exhibit 3, as were other documents that indicate McCarroll and Heidelberger are directors only. [D.E.214 at 83-87]. McCarroll made no employment decisions on his own whatsoever, but was told by Leiva to inform a couple of employees that they were fired, and was present when Leiva fired two other employees in Spanish. [D.E.212 at 46-47]. Under the orders of Leiva, McCarroll once escorted out a manager, Tom Sullivan, with Heidelberger who had been fired for stealing by Leiva. *Id.* at 53. McCarroll signed payroll checks once, because the controller was on vacation. *Id.* at 47-48,77-78.

McCarroll characterized himself as being present approximately 40% of the time or less, because he lived in New York. *Id.* at 54. To the contrary, Ed Leiva was at the business every day running it. *Id.* McCarroll never had any input concerning salaries employees were paid. *Id.* Leiva ran the show. *Id.* at 55. One time Plaintiff Feliciano asked McCarroll if he could get a raise, and McCarroll told Leiva about the request, and Leiva agreed to the raise. *Id.* at 56. Heidelberger told McCarroll that the company should raise its prices, and Heidelberger than told this to Leiva who disregarded Heidelberger's request. *Id.* at 60-61. The minority

ownership that McCarroll had did not give him the authority to tell Leiva or anyone else what to do, as follows:

> Q:  Did the minority ownership that you owned, did that give you the authority to tell the president and CEO Ed Leiva what to do or what not to do when he was operating the company?

> A:  It gave me no authority.  Really it did not.  Ed ran the company.

*Id.* at 82.  Leiva was the boss, and it was his company to run.  *Id.*  In order to theoretically trump Leiva's power, the board would have to convene a meeting and a majority of the ownership would have to vote to trump whatever decision it did not agree with.  *Id.* at 82-83.

McCarroll could not set any corporate policies, and has no supervisory authority over Leiva.  *Id.* at 84.  McCarroll worked with the salesmen when he would come down.  *Id.*  He never supervised any employees, never supervised the Plaintiffs, and was never involved in evaluating the Plaintiffs' work.  *Id.* at 85, 88-89.  McCarroll could not have supervised or evaluated the Plaintiffs' work, because he does not know how—he cannot install shutters himself.  *Id.* at 86, 88-89.  McCarroll has never even seen Plaintiff Milan before in his life.  *Id.* at 86.  McCarroll never worked with the Plaintiffs on installations.  *Id.* at 88.  McCarroll never made any employment decisions concerning the Plaintiffs.  *Id.* at 90.  McCarroll never made any employment decisions concerning any installers.  *Id.* at

91.  McCarroll made no determinations concerning what or how the Plaintiffs were

to be paid.  *Id.* at 91, 92.  McCarroll testified, as follows:

> Q:   With respect to what the plaintiffs were paid did you have any
>      determination with respect to their pay?
>
> A:   None other than the fact that Mario Feliciano had asked me for
>      a raise, and I said I would pass it on to Steve – pardon me –
>      pass it on to Eddie [Leiva], and Eddie subsequently gave him a
>      raise to a thousand dollars [per week].
>
> *   *   *
>
> Q:   Did you have even any involvement at any level concerning
>      policy decisions with respect to how installers would be paid?
>
> A:   None.  I had no involvement in that.

*Id.* at 91.  McCarroll had no involvement concerning what hours installers would

work or whose crew they were to work on.  *Id.* at 92.  McCarroll did not have

operational control, but Leiva did.  *Id.*  McCarroll testified as follows:

> Q:   Were you ever involved in the day-to-day operations or
>      administration of Safe Hurricane Shutters at any level?
>
> A:   No.

*Id.* at 93.  McCarroll had no authority to fire an installer; he was not in charge of

maintaining employee records; he had no involvement in maintaining any business

records; he never gave the department heads any instructions on how to run their

various departments, and he never suggested to Leiva how he should perform his

business day-to-day.  *Id.* at 96.  No overtime issues were discussed in the company.

*Id.*

There were various operational divisions of the company: sales, fabrication, office, accounting, and installation. *Id.* McCarroll had no involvement concerning the warehouse, the fabrication department, or accounting. *Id.* at 94. The one time that McCarroll tried to assert himself to Leiva, Leiva refused to listen to him; Heidelberger and McCarroll told Leiva to change the pricing structure or the company should be closed, and Leiva refused to listen to him, which shows that McCarroll had no say and no real power. *Id.* at 94-95. In fact, Leiva had authority over McCarroll and McCarroll had to do whatever Leiva said. *Id.* at 97.

The company was in business from May 2006 to August 2007. McCarroll was out of the country on a sailboat in July and August, 2007. *Id.* at 95.

*Yerko Aguirre was the manager of the installers.* [D.E.212 at 121]. Aguirre testified that Leiva hired him, because Leiva was opening up a company in South Florida to install hurricane shutters. [D.E.210 at 134]. He knew Leiva to be an honest man who paid fairly, and thus accepted the job. *Id.* His pay was to be $900.00 per week. *Id.* at 135. Leiva never mentioned that he had any partners, and was the person who put the crews and teams together. *Id.* Leiva hired all of the installers. *Id. Aguirre readily admitted that he initially sued the corporate Defendant and Leiva because Leiva ran the business day-to-day.* *Id.* at 137. Aguirre acknowledged that McCarroll was not there day-to-day. *Id.* He said that McCarroll "supervised everything", but then clarified that he would speak to Leiva

14

who was the head of everything, and that McCarroll was simply there at the workplace some of the time. *Id.* at 137-38. *Aguirre admitted that McCarroll was not there enough an involved enough for him to be sued originally*. *Id.* at 138-39. Aguirre admitted that McCarroll was present somewhere between two weeks out of the month or "one-third of the time". *Id.* at 141. Heidelberger was only at SHS for once a month for a couple of days at most. *Id.* at 144.

Ibacache admitted that Leiva made the crews. [D.E.211 at 9]. Ibacache was hired by Leiva, and no one else was involved in that hiring decision. *Id.* at 21, 50. Leiva decided to pay Ibacache $900.00 per week. *Id.* at 22-23. Leiva was Ibacache's direct boss, and assigned him the work. [D.E.212 at 10, 11]. Ibacache was trained by Mark Morris and Mark Saffron to install the hurricane shutters. *Id.* Ibacache would get to the office each day, and then go out and work on a crew all day, to return at the end of the day. *Id.* at 11. Ibacache cannot say what Heidelberger did when he was at the company's office. [D.E. 211 at 16]. While Ibacache said that Heidelberger would go see how the job was being performed, if everything was correct, and if the crews needed anything, *id.*, *Ibacache never spoke to McCarroll or Heidelberger because McCarroll only speaks English and Ibacache only speaks Spanish*. *Id.* at 48. Ibacache saw McCarroll two times per month, but he would stay longer than Heidelberger, as McCarroll would stay for three to four days or sometimes one week. *Id.* at 48, 62 (at 62 admitting he never

communicated with either man).    Heidelberger was at the company one to two times a month for a couple of days.  *Id.* at 55, 56-57.  Ibacache then changed this testimony to admit that Heidelberger only came to Florida to the shop maybe five (5) times during the existence of the company, and said he would defer to Heidelberger concerning that.  [D.E. 212 at 35].  Ibacache was on a crew hanging hurricane shutters and he does not know what Heidelberger did when Heidelberger was in the shop.   [D.E.211 at 55, 56-57].   Ibacache cannot really say what McCarroll did other than he kept track of jobs that were being performed, would visit the job sites, and once a scaffold fell and he asked the workers how it happened.  *Id.* at 17.  Heidelberger might talk to customers, but he has no idea about what.  *Id.* at 74-75.  On one occasion, a worker told McCarroll about some problems with their salaries.  *Id.* at 17-18.

Ibacache said that he cannot say Heidelberger did anything on a regular basis much less exercise operational control because he was hardly ever there, and when Heidelberg was, he hardly ever say him, but he does think that Heidelberger knew what was going on in the company.  *Id.* at 60.  Ibacache testified as follows:

> Q:  With respect to Mr. Heidelberger the absolute most he could have regularly exercised control over you would have been one to two times per month for one to two hours a day; isn't that true?
>
> A:  It is true, but that is enough.

16

> Q:    And that by the broadest most possible definition of the word
>        regular; wouldn't you agree.
>
> A:    . . . Yes.

*Id.* at 61.    Concerning Mr. McCarroll, Ibacache testified that he was at the

company less than half the time, as follows:

> Q:    Mr. McCarroll was at the hurricane company for less than half
>        the time; isn't that true?
>
> A:    . . . Yes.

*Id.* at 62.  Ibacache does not know who wrote the work orders that he was given.

*Id.* at 74.

Plaintiff Feliciano testified about McCarroll and Heidelberger.  Feliciano

was only hired in August, 2006, so he cannot testify about what occurred before

that period of time.  Concerning McCarroll, Feliciano *thought* that McCarroll was

making sure the crew was following the time schedule for the completion of the

job concerning the Point of Americas project, which project occurred for two

months; McCarroll might have gone to the project eight or so times.  [D.E.213 at

31-32].  Feliciano did not meet Heidelberger until September,2006.  *Id.* at 37.

Feliciano thought he saw Heidelberger approximately once per month, and when

he was here he would spend two days here, but then changed his testimony and

admitted that he saw him only in September, October, December, and summer of

2007.  *Id.* at 37-39.  Feliciano does not recall Heidelberger instructing him to do

anything.  *Id.* at 39.  Feliciano claims that Heidelberger had one discussion with him concerning his pay; namely, that when the company fell behind on making payroll in July, 2007, Heidelberger assured him that he would make sure that Feliciano would get paid, but Feliciano claims he did not get paid.  *Id.* at 41-44.

Felciano said that the vast majority of the time that he received work orders he received them from Leiva, and McCarroll gave him some.  *Id.* at 67.  Work orders are just pieces of paper that give a brief description of the work that needs to be done for the day by the crew.  *Id.* at 81,85-86.  Feliciano admitted that by giving out the work orders on occasion it was not as if McCarroll was giving him day-to-day directions on how to perform his job because Feliciano admitted that he knew how to do that, particularly since he knows more than a hundred times more than McCarroll and ten thousand times more than Heidelberger how to install shutters. *Id.* at 86.  Feliciano admitted that neither Heidelberger nor McCarroll know how to install shutters.  *Id.* at 87-88.  Leiva hired Feliciano.  *Id.* at 69.  *Importantly, Feliciano admitted that he was not supervised by McCarroll or Heidelberger, because he worked off of site and was not supervised by anyone*, as follows:

> Q:   You weren't supervised by anybody.  You worked off site, correct?
>
> A:   Yes, sir.

*Id.* at 71.  *See also id.* at 71-72 (testifying that as the crew leader he ran the crew and was not supervised by anyone day in and day out).  *At another occasion in his*

testimony, Feliciano said that Mark and Mike Morris were his supervisors. *Id.* at 125.  Importantly, *Feliciano admitted that Heidelberger did not exercise day-to-day operational control. Id.* at 135.

Plaintiff Milan started at the end of July, 2007, as an installer. *Id.* at 142. *Milan never saw McCarroll or Heidelberger or communicated with them. Id.* at 145. *Leiva hired Milan, and Leiva was known as the head of the installers. Id.* at 157. *It was clear to Milan that Leiva was running the company day-to-day. Id.* at 158. *Milan only spoke to Leiva about pay issues, work assignments, or if there were any problems on the job. Id.* at 159.

Keith Lares a former installer and then controller testified that Heidelberger was hardly ever there, and did not exercise day-to-day operational control and neither did McCarroll.  [D.E.214 at 40-42].  Lares said Leiva had operational day-to-day control.  *Id.* at 42.  Leiva testified that neither McCarroll nor Heidelberger could be considered employers of the Plaintiffs.  *Id.* at 76.

Plaintiff Feliciano committed widespread federal income tax fraud by, *inter alia*, failing to report his earnings from the corporate Defendant on either his 2006 or 2007 tax returns, failing to report cash payments, and by listing false write-offs. [D.E.213 at 48-51, 60].  Feliciano did this even though he knew that he was signing his tax return under penalty of perjury.  *Id.* at 80-81.

Milan also failed to declare his earnings with the corporate Defendant on his 2007 tax return.  *Id.* at 152-53.  Milan used false social security numbers on his tax returns.  *Id.* at 156 (discussing the multiple social security numbers that he was using).  While Milan denied that Leiva asked him for a social security number (or had any conversation with him about tax documents) when he was hired and that he presented a false social security number, he was impeached with this deposition testimony where he admitted he spoke to Leiva about filling out an application for employment and about "tax documents".  *Id.* at 158-59.  Milan is an illegal alien. [D.E.63].

The agreement was that the installers were to be paid by the week, regardless of how many hours that they worked.  [D.E.212 at 52, 56].  Plaintiff Feliciano admitted that he was paid $1,000 per week.  [D.E.213 at 48].  Feliciano's pay agreement was reduced to writing, and when it was, it was described as being a weekly salary.  *Id.* at 58.  Feliciano admitted that his hours varied greatly, but that he would always receive the same weekly salary.  *Id.* at 62.  He cashed the paychecks that he received.  *Id.* at 63.  He testified as follows:

> Q:  Okay.  And so from cashing those checks, that certainly taught you that regardless of how many hours I work in a week, that's the money I'm going to receive from the company?
>
> A:  Unfortunately that was the way.

*** 

20

Q:   . . . You had to have a clear and mutual understanding that no matter how many hours I work, that's what my pay's going to be because it happened for over a year, correct?

***

A:   Yes.

[D.E.213 at 63].   Plaintiff Milan, too, testified that he was paid the same salary ($700 per week) no matter how many hours he worked, and that his hours varied, too.   [D.E.214 at 11-12].   The controller Brad Bungo testified that the clear and mutual understanding existed.   *Id.* at 57-58.

Concerning a new trial on this issue, the Defendants objected at the charge conference to the Court's taking the fluctuating workweek method of calculating damages away from the jury, because that only left the jury with one way to calculate damages, assume that the salary compensated only the first 40 hours and all other hours worked over 40 were completely uncompensated.   [D.E.214 at 130-32].

Feliciano and Milan were on different crews.   [D.E. 213 at 61, 82].   The hours that Feliciano worked could have been determined by accessing the log-in sheets at the condominium complexes that he worked at, but he failed to obtain those sheets during discovery.   *Id.* at 64.   These sheets were subpoenaed by the Defendants and admitted into evidence at the *Palma* trial, and they all showed that Feliciano's crew worked from about 10:00 a.m. to 3:30 p.m. on average at the condominium, and that McCarroll was only there once, and not when Feliciano's

21

crew was even there.  Feliciano admitted that he could only guess as to the hours that he worked in any given week.  *Id.* at 75.

Plaintiff Milan has no idea how many hours he worked in any given week and cannot even guess because his stop varied so much, as follows:

> Q:   Okay.  Now, you actually don't have any idea how many
>      hours you worked on any given day or week, correct?
>
> A:   Yes.

 [D.E.214 at 12].

## B.   STATEMENT OF THE STANDARD OF REVIEW

Post-trial motions based on legal arguments are generally reviewed *de novo*. *Bateman v. Mnemonics*, 79 F.3d 1532 (11th Cir. 1996).  This Court reviews a district court's determination of a Rule 50(b) motion *de novo*.  *Comb v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

## SUMMARY OF THE ARGUMENT

### I.

Heidelberger and McCarroll are not individually liable, because this Court's precedent holds that for an individual to be liable under the FLSA he must be (a)(1) an officer with (2) day-to-day operational control or (b) responsible for the direct supervision over the plaintiff suing.  In this case, Heidelberger and McCarroll were not officers of the company, but rather were minority, absentee owners with the same ownership interest as Leiva, and were not there often enough

to have an opportunity to control the company operationally day-to-day. Heidelberger and McCarroll did not have any responsibility for the direct supervision of the Plaintiffs. When McCarroll and Heidelberger were present, they primarily stayed in the office, while the installer-Plaintiffs worked out in the field, and McCarroll and Heidelberger did not even know how to install the shutters (Plaintiff Milan testified that he never even saw McCarroll—Milan only worked from July to September, 2007 and McCarroll was out of the country during that time—or Heidelberger and had no idea who they even were while Plaintiff Feliciano admitted that they could not install hurricane shutters), and finally, Aguirre was the supervisor of the installers and Leiva was the ultimate officer with management control over the installers, who hired them, fired them, and determined their pay, as the witnesses testified. Alternatively, if JMOL is not granted, reversal is warranted, because the jury was instructed that occasional control was enough, and that the individuals were not required to be officers to be liable.

## II.

The case law is very clear that an award of overtime by a jury must be reduced to a net amount (payroll taxes must be deducted from it as required by federal law) because it constitutes back unpaid wages. It was error for the court to disregard the clear law on this issue from other circuits, and to disregard general

circuit precedent on this issue in employment cases other than ones involving the FLSA.

### III.

The court committed reversible error by not granting JMOL as to the applicability of the fluctuating workweek method, because the testimony was that the Plaintiffs were paid a salary, their hours varied, and they cashed their paychecks, and thus the law views this situation as the Plaintiffs being compensated for all hours worked by the salary, and that, if anything, they are only owed an additional half-time, not time and one-half for all hours they can prove they worked over 40 in a workweek. The court compounded this error by refusing to instruct the jury as to the method at all, but rather only instructed the jury as to the time and one-half method, which was essentially a grant of JMOL in favor of the Plaintiffs as to this issue.

### IV.

The court committed error by allowing Milan to recover, because he applied for work with false social security information, and both he and Plaintiff Feliciano failed to report any of their earnings with SHS to the federal government on their tax returns. The doctrine of *in pari delicto* should prevent the Plaintiffs from recovering in this situation, and this Court has applied that doctrine in similar cases brought pursuant to similar statutes.

## V.

The court committed error by failing to allow Leiva to testify that Ibacache said that Plaintiffs' counsel, Zidell, fabricated all of the overtime claims in the suit, and that such claims have no legitimacy.  This was not hearsay, and Ibacache could not deny that he made these statements against interest (he had his own claim against the Defendants in another suit—*Palma*).  Additionally, if it was hearsay it falls within exceptions to hearsay, because it shows a common scheme.  This evidence was particularly relevant, because the Plaintiffs can only guess as to what overtime they worked, and other testimony was that the SHS had a schedule in place so overtime would never be worked.

## VI.

The sufficiency of the evidence concerning overtime being worked for any particular workweek is lacking, because the Plaintiffs could only guess as to the hours that they worked.

## **ARGUMENT**

**I.    The District Court Committed Reversible Error in Failing to Grant Rule 50 in Favor of the Defendants' on the Ground that the Individual Defendants Are Not Individually Liable, When Those Defendants Were Not Officers, Were Only Absentee Minority Owners, Had No Day-to-Day Control (Everyone Admitted Defendant Ed Leiva Had Such Control), Defendant Heidlberger Was Not Even There Once a Month for a Couple of Days, Defendant McCarroll Was Only There About Half of the Time, and Had No Interaction with the Installer-Plaintiffs but Rather Only the Sales Staff, and Neither Heidelberger Nor McCarroll Supervised the Plaintiffs or Set Their Pay, Nor, as Minority Owners, Could They Have Any Say in Such Decisions; Alternatively, a New Trial Is Warranted Because of the Jury Instructions.**

Tellingly, in this case, McCarroll and Heidelberger were only added as party-defendants *after* Plaintiffs' learned that SHS and Leiva were impecunious. Because they were just afterthoughts to try to collect from, that speaks volumes as to the fact that they really are not individually liable, or they would have been sued initially. Section 207(a) of the FLSA provides, in relevant part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Simply put, the FLSA requires an employer to pay overtime at a rate of one and one-half the employee's regular rate for all time worked over 40 hours in a week, as long as that employee is engaged in commerce or in the production of goods for commerce. *Id.*

Under the FLSA, an individual corporate officer can be considered an employer. Title 29 U.S.C. § 203(d) defines an "employer" as "any person acting directly or indirectly in the interest of the employer in relation to an employee." 29 U.S.C. § 203(d). This Court has routinely interpreted this phrase to mean that an individual employer must be 1) a corporate officer 2) with operational control (involved in the day-to-day operations of the business) or involved in the setting of wages in order to be an employer under the Act. *Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150,1160-61 (11[th]Cir.2008); *Patel v. Wargo,* 803 F.2d 632,637 (11[th]Cir.1986) (citing *Donovan v. Agnew,* 712 F.2d 1509,1511 (1st Cir. 1983)). *See also Casseus v. First Eagle, L.L.C.*, 2008 WL 1782363 (S.D.Fla., Apr. 18,2008).

The *Perez* case is illustrative. In that case, this Court made clear that "a corporate officer with day-to-day control . . . is an employer along with the corporation, [and is] jointly and severally liable under the FLSA for unpaid wages." *Perez*, 515 F.3d at 1160. This Court stated that its previous precedent "made clear that in order to qualify as an employer for this purpose, an officer

'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee [the plaintiff].'" *Id.* The court further stated that

> Our decision in *Patel* is instructive. There we held that the defendant, who was both the president and vice-president of a corporation, as well as a director and a principal stockholder, was not an employer for FLSA purposes. We reached that conclusion because he did not 'have operational control of significant aspects of [the company's] day-to-day functions, including compensation or employees or other matters in relation to an employee.'

*Id.* The Court then approvingly cited to *Wirtz v. Pure Ice Co.*, 322 F.2d 259,263 (8th Cir.1963), which had held that absentee majority stockholders who visited the company a few times per year and had nothing to do with setting the wages of the employees was not liable as an employer under the FLSA. *Id.* at 1160-61. In *Perez*, the Court affirmed the trial court's grant of judgment as a matter of law in favor of the individually named owner (Collins Sr.), because it held that he did not have operational control day-to-day, but only had ultimate authority that he could exercise, but rarely did.

In this case, as an initial matter, neither Heidelberger nor McCarroll are officers, but rather are only minority shareholders at the director level. [D.E.212 at 43, 44-45, 106]. They had 22% ownership interests in the company. *Id.* Leiva also had a 22% ownership interest in the company, and several other people had ownership interests in the company. [D.E.256]. Since McCarroll and

Heidelberger are not officers, they cannot be liable, under the clear holdings of *Patel* and *Perez*. Further, they did not have day-to-day operational control over the business, and they made no employment decisions at all (concerning laborers like the Plaintiffs), and no decisions whatsoever with respect to the setting of pay. [D.E.212 at 85, 88-92, 95]. Accordingly, it is clear that JMOL should be granted in favor of Defendants Heidelberger and McCarroll.

There is a case applying the rubrics from *Patel* and *Perez* that strongly suggests that reversal is warranted here. *Santos v. Cuba Tropical, Inc.*, --F. Supp. 2d--, 2011 WL 5361118 (S.D. Fla.). In *Santos*, the court granted summary judgment as to individual liability, because 1) the individual was not present on the premises, even though he was a part owner who could have stepped in and ran the business at any time; 2) even though he signed the paychecks of all the employees every week, he did not set pay; 3) although he hired the initial management team, and kept in touch with management telephonically, the *Patel* and *Perez* cases require the conclusion that he was not an officer with day-to-day operational control. The court noted that in *Patel* the individual defendant was an officer, the principal shareholder, who fired the plaintiff, but that was not sufficient for liability. *Id.* *6. Notably, here, unlike *Santos*, Heidelberger never signed any checks and was not a signatory, and McCarroll only signed the checks once, because the controller was not present; also, Leiva hired the management team

29

without any input from McCarroll or Heidelberger, and made all hiring and firing decisions without their input.

Tellingly, *Plaintiff Milan never even met Heidelberger or McCarroll and do not know who they were, and thus at a minimum JMOL is appropriate as to his claim, because they could not possibly have supervised him or controlled him day-to-day.  This is supported by the fact that McCarroll was not even present for the months of July and August 2007, when Milan worked.  JMOL is warranted as to Plaintiff Milan.*

Alternatively, if the Court does not grant JMOL on this issue, the Court should grant a new trial because of the jury instructions.  The court instructed the jury that an individual could be liable under the FLSA if they are an officer *or* a director.  This is inconsistent with Eleventh Circuit precedent that the individual must be an officer with day-to-day control.  The reason that this is error is because officers with day-to-day control ostensibly can ensure that the FLSA is being followed, while directors (who typically are not involved in day-to-day operations—and the directors here were not) cannot, because they do not have the authority—the officers running the company day-to-day do.  Therefore, this instruction precluded the Defendants from arguing that the jury should find for them because they are not officers.  In fact, the proposed instruction offered by the Plaintiffs stated that the jury needed to find that Heidelberger and McCarroll were

officers, which is indicative of the fact it is a correct statement of the law. [D.E.179]. The fact that the jury was not instructed that they had to find Heidelberger and McCarroll to be officers and that it was not simply instructed that they must find Heidelberger and McCarroll to be officers with day-to-day operational control over the business constitutes error and should require a new trial, if JMOL is not entered in their favor.

On this issue of supervision, the *Perez* case makes clear that the type of supervision that is germane to individual liability is "direct responsibility" for the supervision of the plaintiff. *Id.* The only testimony concerning the direct responsibility for the supervision of the Plaintiffs was that the individual Defendants did not have such responsibility nor could they have. Neither was even present enough at the corporate Defendant's workplace for that, and even when the individual Defendants were at the Defendant's offices, they were in the offices and rarely out in the field. This is why JMOL is warranted for Heidelberger and McCarroll.

It should be relatively clear to the Court that had McCarroll or Heidelberger said anything to Leiva about the pay of the employees, Leiva would likely have ignored them. He did with the pricing issue that they brought to his attention. They had no power to do anything concerning pay or any other day-to-day operational decision of the business, which is why they are not properly held liable

31

individually under the FLSA.  In essence, they did not make operational decisions, and they had no power to make operational decisions if they wanted to.  Same makes it inherently unjust for them to be found individually liable, and should require a grant of JMOL in their favor.  At a minimum, a new trial should be ordered concerning their liability with jury instructions that instruct the jury that they must find the individual Defendants to be officers with day-to-day operational control.

The instructions also stated that "occasional" control can be enough.  This misstates the law, because "occasional" is anathema to day-to-day control.  It was also reversible error for the Court to fail to instruct the jury that any control over an employee in determining individual liability is limited to control over the employee-plaintiff, or individuals in his same position.  The instructions on these two points constitute reversible error, because 1) it allowed the Plaintiffs to argue that even if McCarroll and Heidelberger were hardly ever there they were there occasionally, and if they could have occasionally controlled things then they should be found liable—this was reversible error, because it is contrary to *Patel* and *Perez*, and 2) it allowed the Plaintiffs to argue that McCarroll's work with the salesmen (none of whom sued) could be used to hold him liable here.  This is wrong.  Only McCarroll's work with the installer-plaintiffs, which was minimal at best, should be a factor in that.

The case *Olivas v. A Little Havana Check Cash, Inc.*, 324 Fed.Appx. 839 (11th Cir. 2009), was relied on by the Plaintiffs for their argument that occasional control is enough, but the case is unpublished and thus not binding, and to the extent that it is inconsistent with *Patel* and *Perez* should be disregarded. In that case, the individual was an officer along with the spouse, and evidence was adduced from which a jury could find that she had day-to-day control, particularly when her spouse was absent. The Court in that case did reiterate that "status as a corporate officer alone is insufficient to render an individual an 'employer' to hold the officer personally liable for unpaid wages." *Id.* Again, the reliance on *Olivas* by the court to instruct that occasional control is enough was error, because individuals were held individually liable who had no say in how wages should be paid, and whether the FLSA should be followed or not.

> **II. The District Court Committed Reversible Error When It Failed to Reduce the Jury Verdict to a Net Amount from the Gross Wages that Were Awarded by the Jury, and the Court Should Note that Reducing Plaintiff Milan's Gross Award to a Net Amount Is Illegal, Because He Is an Illegal Alien, Which Should Warrant JMOL in Favor of the Defendants.**

Concerning the two Plaintiffs who prevailed at trial, the amounts that they were awarded need to be reduced to a net figure, because the employer must withhold federal payroll taxes. 26 U.S.C. § 3402(a)(1); Rev. Rul. 72-268 ("since the payments of unpaid minimum wages and unpaid overtime compensation were

'remuneration for employment', it is held that payments are 'wages' for purposes of the Federal Insurance Contributions Act"); 1972-1 C.B. 313; *Renteria v. Italia Foods, Inc.*, 2003 WL 21995190 (N.D.Ill.); *Archie v. Grand Central P'ship, Inc.*, 86 F.Supp.2d 262, 273 (S.D.N.Y.2000) (noting that in the FLSA context "courts are generally of one mind that withholding from back wages must be made"); *Ford v. Kaufman*, 1985 WL 584, *1 (N.D.Ill.).  Any failure to do this would result in a violation of the income tax provisions of the United States Code.  This should be obvious to the Plaintiffs and to the Court because overtime constitutes wages, and when overtime is paid by an employer as wages, tax withholding must be made.  It is a crime not to pay payroll tax withholding to the government.  26 U.S.C. § 7202. Violations of § 7202 are being prosecuted and violators are going to prison. *United States v. Batmasian*, Case No. 08-60089-CIV-MARRA (failure to pay $11,000 in payroll tax withholding led to a prison sentence).  It was error for the district court to fail to reduce the gross amount to a net figure.

**III. The District Court Committed Reversible Error When it Failed to Instruct the Jury as to the Fluctuating Workweek Method of Calculating Overtime, and When it Failed to Grant Rule 50 in Favor of the Defendants as to Its Application, Given that the Plaintiffs Were Paid A Salary Every Week No Matter How Many Hours That They Worked, Their Hours Fluctuated Every Week, and They Always Cashed Their Paychecks; Alternatively, a New Trial Is Warranted on This Issue.**

Defendants set forth, *supra*, above how typically an employee owed overtime, is owed time and one-half their regular rate. 29 U.S.C. § 207(a)(1). The FLSA does not define the term "regular rate" for purposes of the statute. The Supreme Court, in interpreting this section of the FLSA, first announced and approved of the fluctuating workweek method of calculating an employee's regular rate in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572,580 (1942). The fluctuating workweek method is now codified in the Department of Labor's regulations. 29 C.F.R. § 778.114. Numerous circuits have approved the use of the fluctuating workweek method, including the Eleventh Circuit. *Davis v. Friendly Express Inc.*, 2003 WL 21488682, *2 (11thCir.2003); *Condo v. Sysco Corp.*, 1 F.3d 599,602 (7thCir.1993); *Highlander v. K.F.C. Int'l Mgmt. Co.*, 805 F.2d 644,647-48 (6thCir.1986).

The Eleventh Circuit in *Davis v. Friendly Express Inc.*, 2003 WL 21488682, *2 (11thCir.2003), affirmed the district court's grant of summary judgment in favor of the defendant-employer on the issue of the applicability of the fluctuating

35

workweek method of calculation. Moreover, unlike exemptions, the "plaintiff carries the burden of proving all elements of a FLSA claim", *id.* *3 n.4, and therefore, while "the employer generally bears the burden of showing that [an] exemption applies . . . *the fluctuating workweek method is an alterative* [sic] *means of complying with the overtime provisions of the FLSA; it is no exemption from those provisions.*" *Id.* (emphasis added). Thus, the burden of showing why the Court should deviate from the regulations propounded by the Department of Labor concerning the fluctuating workweek calculation method falls squarely on Plaintiffs, who have produced no evidence to carry that burden.

Title 29 C.F.R. § 778.114 concerns the fluctuating workweek method of calculating overtime payments for employees who, like Plaintiff, receive a fixed salary each week regardless of the actual number of hours worked. Title 29 C.F.R. § 778.114(a) states in relevant part:

> such a salary arrangement is permitted by the Act if [1] the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and [2] if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a).

First, the amount of salary Plaintiff received from Defendants was "sufficient to provide compensation to the employee at a rate not less than the

applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest." Plaintiffs received weekly salaries of $1,000.00 and $700.00 for their work. Plaintiffs cannot guess as to the hours that they worked, but those hours could not have been more than 120, which they would have to be to constitute a minimum wage violation. Thus, the regular rate paid to the Plaintiff in every week he worked for Defendants far exceeded the federally-mandated minimum wage, even "in those workweeks in which the number of hours worked is greatest." 29 C.F.R. § 778.114(a).

Second, the language of the regulation makes clear that an employee who is paid a regular *weekly* salary, as opposed to an *hourly* wage, is to receive overtime compensation of only *one-half* the regular rate of pay for any hours worked over forty, *not* the one-and-one-half rate that hourly wage employees receive. 29 C.F.R. § 778.114(a).

The Eleventh Circuit has determined that, in a case where "the base amount was constant although the number of hours varied from week to week," as in this case, the plaintiff-employee "received a regular lesson - in the form of [his] paychecks - about how the fluctuating workweek plan operates." *Davis v. Friendly Express Inc.*, 2003 WL 21488682,*2 (11thCir.2003) (citing *Griffin v. Wake County,* 142 F.3d 712,716-17 (4thCir.1998)). This "regular lesson" constituted a "clear mutual understanding" for the Eleventh Circuit. *Id.* Plaintiffs received an

37

identical lesson here by accepting their weekly paychecks over the course of several months. Plaintiffs' testimony demonstrates that they clearly understood that their weekly wage covered all hours worked. As explained below, Plaintiffs' testimony in this regard satisfies the "clear mutual understanding" requirement of the regulation.

The agreement was that the installers were to be paid by the week, regardless of how many hours that they worked. [D.E.212 at 52, 56]. Plaintiff Feliciano admitted that he was paid $1,000 per week. [D.E.213 at 48]. Feliciano's pay agreement was reduced to writing, and when it was, it was described as being a weekly salary. *Id.* at 58. Feliciano admitted that his hours varied greatly, but that he would always receive the same weekly salary. *Id.* at 62. He cashed the paychecks that he received. *Id.* at 63. He testified as follows:

> Q:   Okay. And so from cashing those checks, that certainly taught you that regardless of how many hours I work in a week, that's the money I'm going to receive from the company?
>
> A:   Unfortunately that was the way.
>
> ***
>
> Q:   . . . You had to have a clear and mutual understanding that no matter how many hours I work, that's what my pay's going to be because it happened for over a year, correct?
>
> ***
>
> A:   Yes.

38

[D.E.213 at 63].  Plaintiff Milan, too, testified that he was paid the same salary ($700 per week) no matter how many hours he worked, and that his hours varied, too.  [D.E.214 at 11-12].  The controller Brad Bungo testified that the clear and mutual understanding existed.  *Id.* at 57-58.

Concerning a new trial on this issue, the Defendants objected at the charge conference to the Court's taking the fluctuating workweek method of calculating damages away from the jury, because that only left the jury with one way to calculate damages, assume that the salary compensated only the first 40 hours and all other hours worked over 40 were completely uncompensated.  [D.E.214 at 130-32].  Alternatively, if JMOL is not granted on this issue, the Defendants request that the damages that were awarded to the Plaintiffs by the jury's verdict by reduced by two-thirds to take into account the application of the fluctuating workweek method, because its application results in such reduction.

**IV.  The District Court Committed Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to Plaintiff Milan, Because He Applied for Work With False Social Security Documents and Committed Income Tax Evasion Concerning His Earnings While Working for the Defendants and, Concerning Plaintiff Feliciano, His Income Tax Evasion, as Well, Pursuant to the Doctrine of *In Pari Delicto*.**

Plaintiff Feliciano committed widespread federal income tax fraud by, *inter alia*, failing to report his earnings from the corporate Defendant on either his 2006

or 2007 tax returns, failing to report cash payments, and by listing false write-offs. [D.E.213 at 48-51, 60]. Feliciano did this even though he knew that he was signing his tax return under penalty of perjury. *Id.* at 80-81.

Milan also failed to declare his earnings with the corporate Defendant on his 2007 tax return. *Id.* at 152-53. Milan used false social security numbers on his tax returns. *Id.* at 156 (discussing the multiple social security numbers that he was using). While Milan denied that Leiva asked him for a social security number (or had any conversation with him about tax documents) when he was hired and that he presented a false social security number, he was impeached with this deposition testimony where he admitted he spoke to Leiva about filling out an application for employment and about "tax documents". *Id.* at 158-59.

It is a federal crime to apply for work using false social security numbers and to use multiple social security numbers. 8 U.S.C. § 1546(a)(1) (making it a felony for an illegal alien to apply for a job using false social security information). Any aiding and abetting of an illegal alien to remain in the country longer is a federal crime, punishable by 10 years' imprisonment. *Id.* § 1324(a)(1)(B)(i). Further, any assistance to and/or transportation of illegal aliens is felonious. 8 U.S.C. § 1546(a).

Regardless of the issue of immigration status, the Defendants assert that the doctrine of *in pari delicto* prohibits the Plaintiffs from recovery, because of the

Plaintiffs' failure to pay income taxes on any of their earnings with the federal government, regardless of their immigration status.  *United States v. Snipes*, 611 F.3d 855 (11$^{th}$Cir.2010) (affirming conviction and sentence of 36 months imprisonment for the actor Wesley Snipes for failing to file income tax returns).

In general, the unclean hands defense (a corollary to the *in pari delicto* doctrine) applies to FLSA cases.  *Neuman v. CTRL Sys., Inc.*, 2009 WL 4730722 (S.D.Fla.2009) (refusing the strike the affirmative defense of unclean hands raised in an FLSA case).  It is a disgrace to the Court to allow a plaintiff that comes before the Court illegally to prosecute a cause of action, much less be awarded anything by the Court system.  The courts have authored opinions that apply to the facts of this case, which disallowed a plaintiff from so prosecuting an action, *Neiman v. Provident Life & Accident Ins. Co.*, 217 F.Supp.2d 1281 (S.D.Fla.2002) (Moreno, J.) (disallowing a party who was illegally practicing law from suing under an insurance contract to recover disability benefits), including the Eleventh Circuit.  *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11$^{th}$Cir.2006) (disallowing a party engaged in illegal conduct to prosecute a RICO cause of action; holding the defense of *in pari delicto* applies to actions at law).

In *Neiman*, the court framed the issue as being "whether Neiman can enforce the policy to recover disability benefits despite his illegal occupation."  *Neiman*,

217 F.Supp.2d at 1286.  The court held that Neiman "is precluded from doing so." *Id.*  The court observed that to allow Neiman, who had been practicing law without a license, "to proceed to trial to obtain benefits that would indemnify the loss of his illegal income would . . . legitimize his conduct".  *Id.* at 1283.  The court noted that Judge Middlebrooks referred Neiman to the United States Attorneys' Office for criminal investigation (which the court should do here for both immigration and tax violations).  *Id.* at 1284.  The court reasoned that parties to an agreement are generally free to contract out of or around federal or state law, but they may not enter a contract that is void as a matter of public policy.  *Id.* at 1286.  While in this case there was no actual contract of employment, at-will employment is contractual in nature, as they are an agreement to work for certain remuneration. Such agreements that are contrary to public policy are void because they have no legal sanction and establish no legal bond between the parties.  *Id.*  To be void as a matter of public policy the agreement must have a bad tendency or contravene the established interests of society, and to determine that courts look "primarily to statutes".  *Id.*

When an illegal immigrant applies for work with false social security information (like Plaintiff Milan here) with an employer, because that is illegal conduct, clearly such an at-will employment agreement contravenes the established interests of society.  *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137

(2002) (holding that the landmark Immigration Reform and Control Act of 1986, known as IRCA, "forcefully made combating the employment of illegal aliens central to the policy of immigration law."); 8 U.S.C. § 1546(a) (applying for work using false social security information is a felony); 8 U.S.C. § 1324c(a) (illegal to work in the United States without the proper documentation from the government). Numerous courts are recognizing that illegal aliens who use false social security information are barred from recovering under the FLSA, though those holdings are predicated on the fact that the plaintiffs applied for work using false social security information. *Ulin v. Lovell's Antique Gallery*, 2010 WL 3768012 (N.D.Cal.) and *Renteria v. Italia Foods, Inc.*, 2003 WL 21995190 (N.D.Ill.), and others are accepting Defendants' interpretation of *Hoffman* as set forth below. *Jin-Ming Lin v. Chinatown Restaurant Corp.*, 771 F.Supp.2d 185 (D. Mass.2011).

This Court has previously held that illegal immigrant workers can recover under the FLSA. *Patel v. Quality Inn South,* 846 F.2d 700 (11[th]Cir.1988). Notwithstanding the *Patel* decision, the arguments in this case go far beyond *Patel*, because the subsequent *Hoffman* decision requires the conclusion that the *Patel* decision was overruled *sub silentio*. Defense counsel argued this same issue in *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292 (11[th]Cir.2011) (Korman, J., dissenting), but the court did not reach the issue. The basis for the *Patel* decision is that the passage of IRCA does not require the conclusion that

illegal immigrant workers cannot recover under the FLSA.  *Id.*  The *Hoffman* case

directly undermines that holding, because it directly holds that the enactment of

IRCA changes the analysis with respect to recovery under civil remedial statutes

for illegal immigrant workers, as it explained that providing illegal immigrant

workers with remedies under the NLRA "would unduly trench upon explicit

statutory prohibitions critical to federal immigration policy, as expressed in

IRCA."  *Hoffman*, 535 U.S. at 151.[1]  The Court noted that allowing illegal

immigrant workers to recover under our civil statutes "not only trivializes the

immigration laws, it also condones and encourages future violations", *id.* at 150,

and "would encourage the successful evasion of apprehension by immigration

authorities, condone prior violations of the immigration laws, and encourage future

violations."  *Id.* at 151.  The *Patel* decision reasoned differently, and that reasoning

---

[1] The *Hoffman* holding was extremely direct:

> The National Labor Relations Board (Board) awarded backpay to
> an undocumented alien who has never been legally authorized to
> work in the United States.  We hold that such relief is foreclosed by
> federal immigration policy, as expressed by Congress in the
> Immigration Reform and Control Act of 1986 (IRCA).

*Hoffman*, 535 U.S. at 140.  This holding clearly overrules *Patel sub silentio*.  The
*Hoffman* Court went even further by noting that any sort of serious illegal activity
related to their employment on the part of an employee trying to seek relief under
civil remedial statutes prevents such "employees" from recovering.  *Id.* at 143
(stating that "we have consistently set aside awards of reinstatement or backpay to
employees found guilty of serious illegal conduct in connection with their
employment").

has been rejected by the Supreme Court.  Moreover, the *Patel* decision was enacted more than twenty (20) years ago, where the problems with illegal immigration and the employment of illegal immigrant workers had not reached the exponential proportions that they are at now in 2011, when this country is spending unprecedented sums of money to combat their entry, their residing here, and their being employed here.  In *Patel*, the *in pari delicto* doctrine was not raised by the defendant.  Also, there was no issue in *Patel* that the plaintiff violated federal law by applying for work with false social security information.

The first Restatement of Contracts defined an illegal bargain as being illegal "if either its formation or its performance is criminal, tortious or otherwise opposed to public policy."  Restatement, *Contracts* § 512.  As stated by one court, "public policy can be enunciated by the Constitution, the legislature, or the courts at any time and whether there is a prior expression or not the courts can refuse to enforce any [agreement between two parties] which they deem to be contrary to the best interests of citizens as a matter of public policy."  *Anaconda Federal Credit Union v. West*, 483 P.2d 909,911 (Mont.1971).  Concerning the issues at hand, no one would argue that tax evasion is not contrary to public policy, as it is contrary to federal law (and is a criminal violation), and no one would argue that applying for work with false social security information while having the status of being an illegal immigrant and working in the country illegally is not a violation of public

policy, given IRCA. *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002) (holding that the landmark Immigration Reform and Control Act of 1986, known as IRCA, "forcefully made combating the employment of illegal aliens central to the policy of immigration law."); 8 U.S.C. § 1546(a) (applying for work with false social security information is a felony); 8 U.S.C. § 1324c(a) (illegal to be in the United States, and illegal to work in the United States without the proper documentation from the government).

The starting point for a discussion of illegality is the maxim, *in pari delicto potior est conditio defendentis*—in a case of equal fault the condition of the defending party is the better one. In short, the Court will leave the parties where it finds them. Two basic policies underlie this principle. First, a refusal to enforce an agreement that is against public policy will deter the making of such contracts in the future. *Weil v. Neary*, 278 U.S. 160,173-74 (1929). Second, the application of the doctrine "keeps the courts respectable." Havighurst, *The Nature of Private Contract* 53 (1961). This latter policy is often colorfully expressed. For example, one court characterized it as "no polluted hand shall touch the pure fountains of justice." *Collins v. Blantern*, 95 Eng. Rep. 850,852 (1767). Courts have noted that they refuse to act "as paymasters of the wages of crime." *Stone v. Freeman*, 82 N.E.2d 571,572 (N.Y.1948). One court pithily put it this way: "[s]traight shooters should always win, but one there are none, bad guys need not look to us for help."

*Certa v. Wittman*, 370 A.2d 573 (Md.1977). Indeed, the cases that hold that plaintiffs will recover nothing who have unclean hands are legion. *Thomas v. Ratiner*, 462 So.2d 1157 (Fla.3dDCA1984) (holding that an attorney could not recover any of his attorney fees although he prevailed, because the attorney illegally procured the retainer agreement while the plaintiff was in the hospital in violation of a statute prohibiting same); *Sirkin v. Fourteenth Street Store*, 108 N.Y.S. 830 (N.Y.Sup.Ct.,1stDep't1908) (holding that fraud in the inducement—commercial bribery—rendered a contract for hosiery unenforceable, even though there was nothing illegal about the agreement to sell the hosiery, because the illegal bribe tainted the whole agreement); *Tocci v. Lembo*, 92 N.E.2d 254 (Mass.1950) (lawful agreement to build a house unenforceable because in constructing the house the plaintiff used materials, that were being rationed by the federal government, without the proper approval from a federal agency—court refused to award illegal conduct).

The *Neiman* Court reasoned that the rationale of the rule is that the judiciary as an institution will not provide aid to enforce an obligation that arises from an illegal agreement. *Neiman*, 217 F.Supp.2d at 1286. This Court issued a ruling similar to *Neiman* conceptually, in that case holding that the doctrine of *in pari delicto* applies to bar the bringing of a RICO cause of action, and noting that the defense applies to legal causes of action, such as RICO claims. *Official Committee*

47

*of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11<sup>th</sup>Cir.2006). Other courts have also so held. *Nisselson v. Lymont*, 469 F.3d 143 (1<sup>st</sup>Cir.2006) (allowing *in pari delicto* defense to bar the bringing of a securities fraud cause of action); *In re Today's Destiny, Inc.*, 388 B.R. 737 (S.D.Tex.2008) (noting that the defense is not limited to contract causes of action, but applies to all causes of action); *Decatur Ventures, L.L.C. v. Stapleton Ventures, L.L.C.*, 2006 WL 1367436 (S.D.Ind.) (noting that the Seventh Circuit has held that Federal Rule of Civil Procedure 2, which blends law and equity claims and defenses, allows for the *in pari delicto* defense (or unclean hands defense) to apply to legal causes of action and remedies).[2]

As Defendants noted above, a Court allowing an illegal alien who applied for work with false social security information to proceed with a Federal Court case (*e.g.*, by coming into the courtroom and testifying at a hearing) presents all sorts of practical and policy-based problems. 18 U.S.C. § 4 (prohibiting "misprision of a felony"); 8 U.S.C. § 1324(a)(1)(A)(iii) (making it a crime to shield unauthorized aliens from detection). Coupled with the problem of Plaintiff Milan's illegal status, Plaintiffs have not paid income taxes on any of the money

---

[2] These courts note that the *in pari delicto* defense typically applies to parties that are both involved in illegal activity, that the court will leave such parties as it finds them. Here, however, there are no allegations that the Defendants were involved in immigration fraud or other illegal conduct. Thus, the Defendants assert that this is not a case in which both parties come before the Court with dirty hands, but only the Plaintiffs have unclean hands. The argument is conceptually estoppel.

earned from their employment with the Defendants, and they will not pay any if they satisfy a judgment or other award from this litigation, which should require judgment for the Defendants or in the alternative a new trial. The Defendants submit that this Court should conclude that an illegal alien who obtained work fraudulently (and a non-illegal alien), who has defrauded the federal government out of tax dollars related to their employment, should not be able to recover, because the Court should not entertain any claims they may have, and would essentially be in the position of an enabler—enabling the Plaintiffs to commit felonious activity. This should go without saying.

Our own Supreme Court has stated that "indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship" and reporting criminal activity is a "deeply rooted social obligation." *Roberts v. United States*, 445 U.S. 552,557-58 (1980). Further, our Supreme Court has stated that "the common law recognized a duty to raise the 'hue and cry' and report felonies to the authorities. . . . It is apparent from this statute [18 U.S.C. § 4 (prohibiting misprision of a felony)], as well as from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium." *Branzburg v. Hayes*, 408 U.S. 665,696-97 (1972) (citations omitted). Applying for work with false social security information is being prosecuted in Southern Florida and illegal aliens caught doing

same are being deported.  *Aguilar v. E.C. Mgmnt. Corp.*, Case No. 11-23581-CIV-SEITZ and *Aguilar v. E.C. Mgmnt. Corp.*, Case No. 12-20678-CIV-MORENO (an illegal alien was apprehended by ICE immediately upon exiting a federal courthouse for a settlement conference in a FLSA case and deported).

There are multiple reasons why the doctrine should apply to illegal aliens attempting to bring claims under the FLSA.  One need only review the recent panel decision in *Norelus v. Denny's Inc.*, 628 F.3d 1270 (11thCir.2010), in which an illegal alien concocted lies about sexual harassment that are legendary.  Illegal aliens will tend to lie because they have no fear.  They are already here illegally, not paying taxes illegally, and thus why would they care if they caught committing perjury on top of it?  They have a chance at $10,000, $20,000 or more, which is a fortune in the countries that they are from.  It proves too much to resist.

At a minimum, the Court should reverse and remand with directions that the IRS be contacted about the situation.  Under what has become known as "The Ingmar Johansson rule", when it becomes clear that an alien is not going to be pay income taxes on earnings in America, the IRS is entitled to seize those assets and before they are distributed take the taxable money directly from them.  *United States v. Johansson*, 62-1 U.S. Tax Cas. ¶ 9130 at 83,197 (S.D.Fla.1961), *aff'd in part and remanded in part*, 336 F.2d 809 (5thCir.1964).  The Court should give the federal government the ability to apply this rule in this case, because testimony at

trial revealed that Plaintiff Milan was an illegal alien, engaging in tax fraud, partly

through the use of false social security numbers.

> **V.  The District Court Committed Reversible Error in Excluding from Evidence Testimony from Defendant Leiva That Witness Rolando Ibacache (Who Was a Plaintiff in the Companion Case *Palma v. Safe Hurricane Shutters, Inc.*, Case No. 07-22913) Told Leiva that Plaintiffs' Attorney J.H. Zidell, Esq. Fabricated the Overtime Claims Instructing the Plaintiffs in this Case and in *Palma* to Say That They Worked 60 Hours Every Week When They Really Worked Less Than 40 Hours Every Week (Ibacache Testified at Trial that He Could Not Deny Telling Leiva This), Which Warrants a New Trial, Particularly When the *Palma* Jury Found in Favor of the Defendants, Including that No Overtime Was Worked and No Minimum Wages Were Owed.**

Concerning the proffered testimony from Leiva that indeed Ibacache told

him that he went to see Zidell to inquire about certain cash payments that he

received from SHS near the end of his employment, Zidell said that everyone

falsely say that they worked 60 hours every week when they really worked less

than 40 hours every week, Defense counsel asked for a sidebar, and he was going

to proffer at the sidebar that Leiva was going to testify that Ibacache did in fact tell

him that the whole case was made up by the lawyer Zidell, and the plaintiffs,

including Ibacache who is a plaintiff in the related *Palma* case, simply went to

Zidell to ask some questions about the last couple of weeks that they were paid in

cash.   This testimony went to a critical issue in the case, as well as cast

considerable doubt on the veracity of the very Plaintiffs in this case (serious impeachment), including that the whole case was brought fraudulently. It was reversible error not to allow this line of questioning, particularly when Ibacache opened the door to it by stating that it may have been said but he could not remember, and Leiva was going to fill in the vacuum by testifying that it was said. This prevented the defense from arguing that the case was fabricated by the attorney. This is particularly prejudicial, because the evidence concerning hours worked was extremely week, as the Plaintiffs could only guess as to the hours worked, and would have seriously bolstered the testimony that the Defendants had a specific schedule that precluded any overtime from being worked. [D.E. 214 at 70, Apr. 15, 2011] ("the schedule was designed so these installers wouldn't exceed 40 hours in a week"). A new trial should be granted, or alternatively JMOL, because this testimony was not admitted. There was no concern that typically arises with hearsay because Ibacache did not deny that he said that to Mr. Leiva, and because Zidell could have taken the stand as a rebuttal witness and denied it if it were not true. Notably, in *Palma*, when the evidence was admitted, there was no attempt to cross-examine Leiva about it and no rebuttal testimony was offered denying that the case was all a fraud.

Leiva's testimony regarding his conversation with Ibacache was improperly excluded, as such testimony fits squarely into a hearsay exception codified in Rule

804 of the Federal Rules of Evidence.  Rule 804, which enumerates several exceptions to the rule against hearsay, states in relevant part:

> *Statement Against Interest*. A statement that:
>
> **(A)**   a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> **(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed.R.Evid. 804(b)(3).  As Ibacache is a plaintiff in a very similar case against Defendants, it is self-evident that his confession to Leiva as to the fraudulent nature of these cases is a statement against his pecuniary interest.  In context, Leiva called Ibacache to confront him with the frivolous nature of the overtime allegations, and Ibacache responded by stating that the suit was fraudulent and meritless, completely undermining Ibacache's own claim.  No person of sane mind would admit to the fraudulent nature of his own claim if the admission was not in fact true.

As with all exceptions enumerated in Rule 804, Rule 804(b)(3) requires the declarant be unavailable.  In the immediate context, when Ibacache was asked about his conversation with Leiva, he responded, "I don't remember."  Ibacache's inability to recall the content of the conversation with Leiva renders him

unavailable an unavailable pursuant to Rule 804, which states in relevant part: "*Criteria for Being Unavailable*. A declarant is considered to be unavailable as a witness if the declarant: . . . **(3)** testifies to not remembering the subject matter . . . ." Fed.R.Evid. 804(a)(3).

Additionally, the conversation need not even be offered for its truth, but simply to show both Ibacache's state of mind as to the fraudulent nature of the claim, and a common scheme devised by Zidell (who has filed over 1,000 FLSA suits) to solicit multiple plaintiffs to file meritless lawsuits against defendants. In this situation, Leiva's testimony about the conversation is admissible under Rule 803, which states in part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (3) *Then-Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed.R.Evid. 803(3). Under this rule, evidence of the conversation between Ibacache and Leiva should be admissible to show Ibacache's personal belief that the claim was fraudulent, Ibacache's motive and/or intent as to bringing the claim, and to demonstrate a common scheme or plan among multiple plaintiffs, orchestrated by Zidell, to defraud Defendants.

On both issues, the case of *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 2011 WL 4916590, *5-7 (N.D.Ind.2011), is illustrative.  In *BKCAP*, an issue arose as to the admissibility of a conversation between plaintiff-borrower and lender pertaining to a bank loan transaction between the parties.  Plaintiff-borrower called its general counsel ("Firth") to testify about a discussion he had with the lender's most senior operating officer ("Schrader") to help resolve a dispute between the parties as to the meaning of particular contract language.  The defendant argued that the content of the conversation was inadmissible hearsay and the court disagreed.  The court found that, as a preliminary matter, Firth's testimony was admissible because the conversation was being offered to prove the intent of the contracting parties, not for its truth. *Id.* at *6.  In the case, *sub judice*, the conversation between Ibacache and Leiva, was being offered for a very similar reason, *i.e.*, Ibacache's motive and intent behind the lawsuit against Defendants and to illustrate a common plan. The court in *BKAP* also found that, in the alternative, even if Firth's testimony about Schrader's statements told him was being offered for its truth, because of the size of the loan transactions and subsequent extreme litigation costs (contrary to Schrader's pecuniary interest), Schrader would not have made his statements unless he believed them to be true. *Id* *7. Schrader testified at an earlier deposition that he did not remember conversations with Firth. *Id.* Again, like here, Ibacache would never have made a

55

statement to Leiva that the lawsuits were meritless unless he believed them to be true.   From Ibacache's perspective, such a statement serves no constructive purpose, and only undermines his very own claim.

### VI. The District Court Committed Reversible Error in Not Granting Rule 50 in Favor of the Defendants as to the Sufficiency of the Evidence that Overtime Hours Were Worked.

An employee who sues for overtime compensation under the FLSA bears the burden of proof by a preponderance of the evidence that his employer failed to properly compensate him for his completed work.  *Olson v. Star Lift, Inc.*, 709 F.Supp.2d 1351 (S.D.Fla.2010); *Laplante v. Lake Worth Terrace*, 725 F.Supp.2d 1358 (S.D.Fla.2010); *Myers v. The Copper Cellar Corporation*, 192 F.3d 546,551 (6[th]Cir.1999).  It is settled that a plaintiff must actually prove the hours that he worked and the overtime to which he is owed.  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233,1277 n.68 (11[th]Cir.2008) (requiring proof of the amount of overtime not paid for overtime hours worked); *Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F.Supp.2d 529,534-36 (N.D.Ill.2006) (stating that when the only evidence is plaintiff's "declaration asserting without specificity that she worked more than 40 hours per week . . . [t]hat . . . is not sufficient to create a genuine issue of fact"); *Dol v. Cielo in the Grove*, 2008 WL 2773552 (S.D.Fla.2008) (dismissing case at the motion to dismiss stage and holding that a plaintiff must

allege "actual hours worked" to state a claim under the FLSA, and must also provide the defendant with fair notice of what the plaintiff's claims actually consist of and the grounds upon which they rest).  Overtime must be proven week by week, and each workweek stands alone 29 C.F.R. §§ 778.103,.104, thus, Plaintiff must prove how much overtime he worked each week, not just provide general testimony to prove his damages.

The plaintiff can typically establish the extent of the overtime for which he was not paid through the discovery and analysis of the defendant-employer's code-mandated records.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680,687-88 (1946).  However, if the Defendant failed to keep accurate or adequate records, the Plaintiff's burden of proof is "relaxed."  *Myers*, 192 F.3d at 551 (citing *Anderson*, 328 U.S. at 687-88).  In such a situation, a Plaintiff can fulfill this relaxed burden of proof "if he proves that he has in fact performed work for which he was improperly compensated *and* if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.  Upon plaintiff's satisfaction of this relaxed burden, the burden is then shifted to the defendant to provide evidence which negates the reasonableness of the inference drawn from Plaintiff's evidence.  *Id.* at 687-88. The relaxed burden applies here because there are no time records for the two Plaintiff installers.

Even though this relaxed burden applies, significantly, courts have recently held within the context of the FLSA that a plaintiff's uncorroborated and conclusory affidavit testimony regarding hours worked is insufficient to meet that plaintiff's burden of proof with respect to his or her alleged damages. *Barrera v. Valero Doral, Inc.,* 2011 WL 4443965 (S.D.Fla.2011) (citing various binding opinions in support thereof); *see also* 29 U.S.C. §§ 206, 207 (recognizing that there is no statutory violation absent a failure to get properly paid). The procedural posture of the *Barrera* case was a ruling on a motion for default judgment. Therefore, the *Barrera* case stands for the proposition that the damages allegations and calculations must be quite detailed in order to withstand a JMOL. Because the trial testimony is devoid of such proof, JMOL is appropriate.

In this case, Plaintiff Feliciano and Milan were on different crews. [D.E. 213 at 61, 82]. The hours that Feliciano worked could have been determined by accessing the log-in sheets at the condominium complexes that he worked at, because he failed to obtain those sheets during discovery. *Id.* at 64. Feliciano admitted that he could only guess as to the hours that he worked in any given week. *Id.* at 75.

Plaintiff Milan has no idea how many hours he worked in any given week and cannot even guess because his stop varied so much, as follows:

    Q:   Okay. Now, you actually don't have any idea how many
           hours you worked on any given day or week, correct?

A:    Yes.

[D.E.214 at 12].  In contrast, the testimony from Leiva was that the schedule he designed for the installers prevented any of them from working overtime, and that no installer ever worked overtime because of the schedule.  [D.E.214 at 70, Apr. 15, 2011] ("the schedule was designed so these installers wouldn't exceed 40 hours in a week").  This requires JMOL, or in the alternative, a new trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand and enter judgment in favor of Defendants as to all Plaintiffs' claims because they evaded their income taxes on their earnings from SHS, alternatively, the Court should enter JMOL as to Defendants McCarroll and Heidelberger on the ground that they are not individually liable, alternatively, grant a new trial as to the individual liability of McCarroll and Heidelberger, alternatively, allow Defendants to elicit testimony from Leiva that Ibacache told him Plaintiff's counsel fabricated the overtime allegations in the suit, alternatively, reduce the awarded amounts by application of the fluctuating workweek method (which will reduce the awarded damages by two-thirds) and then take a new figure from that amount to account for payroll taxes to be paid to the United States government.

## <u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that this Brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).  This Brief is comprised of 13,991 words, not including the Conclusion, Certificate of Service, Certificate of Compliance, and the "i" pages.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been duly furnished by U.S. mail to:  J.H. Zidell, Esq., City National Bank Building, 300 71st Street, Suite #605, Miami Beach, Florida 33141, this 22nd day of February, 2012.

Glasser, Boreth & Kleppin
Attorneys for Appellants
8751 W. Broward Blvd
Suite 105
Plantation, FL 33324
Tel.  (954) 424-1933
Fax  (954) 474-7405
E-mail:  Glabor@aol.com


By_____
    Chris Kleppin
    Fla. Bar No. 625485